UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
                            )    CRIMINAL ACTION
     v.                     )
                            )    NO. 04-10299-PBS
2. DANIEL AGUILAR           )
     a.k.a. "Lik"           )
3. ROBERTO SOLORIO,         )
4. RICARDO MANUEL ESTRADA   )
                            )

UNITED STATES' PRETRIAL MEMORANDUM

The United States respectfully submits this memorandum of
law and fact regarding the upcoming trial of defendants DANIEL
AGUILAR, a.k.a. "Lik," ROBERTO SOLORIO, and RICARDO MANUEL
ESTRADA, scheduled for February 27, 2006.  In support, the
government submits as follows:

I.    FACTUAL SUMMARY[1]

On May 1, 2004, law enforcement agents seized fifty (50)
kilograms of cocaine in Danvers, Massachusetts.  The cocaine was
seized after agents observed defendant RICARDO ESTRADA, a truck
driver from California, deliver two large black suitcases to
defendants DANIEL AGUILAR, a.k.a. "Lik" and Maria Escobar at a
motel in Peabody.  AGUILAR and Escobar drove the suitcases to
defendants Andres Martinez and ROBERTO SOLORIO at a residence at
6 Endicott Street in Danvers where the cocaine was seized.

---

[1]The following is a brief summary of some of the facts the
government anticipates introducing at trial and is intended to be
only a general overview.  The summary does not constitute all the
facts and testimony the government may seek to introduce at
trial.

The seizure of cocaine was the culmination of a year-long wiretap investigation into a Mexican drug trafficking organization run by Valentin Martinez ("Valentin"), Valentin's brother-in-law Manuel Germosen, a.k.a. "Manolo," a.k.a. Kelvin Madera ("Germosen"), and Valentin's uncle, the leader of the organization, Andres Martinez ("Andres"), a.k.a. "Sacaida."  The organization was responsible for distributing large quantities of cocaine that it obtained from a Mexican source of supply that also operated in California and Arizona.

A.   Title III Wiretaps Leading Up to Seizure

Sometime in early 2004, Andres, the leader of the organization returned from Mexico to Massachusetts.  Law enforcement knew about Andres' return to Massachusetts based on Title III wiretaps on cellular phones used by Valentin Martinez and Manuel Germosen.  In particular, agents knew that Andres entered the United States in early February 2004 through Arizona and then traveled to California before arriving in Massachusetts.  On February 20, 2004, DEA began intercepting one of Andres' cellular telephones, telephone number 603-265-0739.  Over this cell phone, Andres had multiple intercepted conversations with DANIEL AGUILAR, a.k.a. "Lik."  During these calls, Andres arranged for AGUILAR to travel from Guadalajara, Mexico to Massachusetts.  Over this same cell phone, Andres also had multiple conversations with a man in Mexico who Andres identified

only as "Nephew" (*Sobrino*).[2]

For example, during two intercepted calls on April 9, 2004, Andres gave the "Nephew" another contact number for him in the U.S. but gave it in what is commonly known as "10-code."  (In 10-Code, the real/decoded number is derived from the number of digits from ten (10) from the coded number.  From example, the coded number 2, yields the decoded number 8 because 2+8=10).  In particular, Andres gave the Nephew coded number 787-276-6460, which yielded California cellular telephone number 323-834-4640.

On April 28, 2004, DEA began intercepting Andres over this telephone number, 323-834-4640, pursuant to a Title III wiretap.  During two consecutive calls on April 30, 2004, at 12:24 PM and 12:27 PM, the "Nephew" told Andres, ". . . We're nearby already . . . Over by you. Uh, what's the number that I could give for them to call you?"  Andres, in 10-code, gave the "Nephew" telephone number 978-223-0838, a cellular telephone number subscribed to Roberto Solorio.  The same day, at 10:25 p.m., Andres called Maria Escobar and asked her if she could come over the house at 9:00 a.m. the following morning.  Based on these intercepted phone calls and surveillance at 6 Endicott Street and 172 Lake Street, law enforcement agents anticipated that a shipment of cocaine would soon be arriving.  Agents had also set up video cameras across the street from 6 Endicott Street in Danvers and 172 Lake Street in Peabody to record the activity at the

---

[2]The Nephew was later identified as defendant Martin Cerna-Garcia, who is currently a fugitive.

residences.

    C.    Transfer of Two Suitcases At Countryside Motel in
        <u>Peabody on May 1, 2004</u>

On May 1, 2004, at around 6:40 a.m., DEA agents using a
video camera[3] outside Andres Martinez's residence at 172 Lake
Street, Peabody observed Martinez and two other males who were
later identified as ROBERTO SOLORIO and DANIEL AGUILAR depart the
residence in two vehicles.  Agents followed SOLORIO and AGUILAR
(driving in a gold/yellow Cadillac sedan), and Martinez (driving
in a silver Ford truck) drive from 172 Lake Street to a gas
station a short distance away located at the intersection of
Winona Street and Route 1 in Peabody near a truck stop.  SOLORIO
pulled up to the pumps in the Cadillac and pumped gas into the
Cadillac while the silver Ford pulled off to the side.

SOLORIO then drove the Cadillac across Route 1 to a motel
called the Countryside Motel.  The silver Ford pickup backed into
the side of the gas station facing the motel across the street.
Moments later, agents watched as AGUILAR and SOLORIO got out of
the Cadillac and walked into the motel's office.  At
approximately 6:56 a.m., DANIEL AGUILAR-PAZOL checked into Room
#19.  Hours before at approximately 1:00 a.m. on May 1, 2004,
defendant RICARDO ESTRADA checked into Room #21 at the same

---

    [3]While agents were able to make these observations as they
occurred that morning, the recording itself is of poor quality
due to a heavy rain.

motel.[4]

After AGUILAR checked into room #14, agents watched SOLORIO exit the motel office, walk across Route 1, get into the passenger side of the silver Ford truck and depart the area with Andres.  Around the same time, AGUILAR got into the Cadillac and parked in front of Room #14.

Minutes later, at 7:08 a.m., as Andres and SOLORIO drove away, Andres called AGUILAR from SOLORIO's telephone number 978-223-0838 (the same number that Martinez provided to "the nephew" in Mexico).  At the time, AGUILAR was using Martinez's cell phone, (323) 834-4640.  During the call, Andres told AGUILAR, " . . . look, pay attention to me, just rest, relax . . . when somebody knocks there at that house . . . There were you are at that country house . . . open the door . . . they are going to give you my clothing."  That "clothing" turned out to be two black suitcases containing 50 kilograms of cocaine.

Minutes later, surveillance units in place at the Countryside Motel observed a Hispanic male later identified as RICARDO ESTRADA walk from the cab of a tractor trailer pulling behind him, on wheels, a large black suitcase.  The suitcase appeared to be heavy.  ESTRADA was observed looking in all directions as he walked with the suitcase from the parking lot

---

[4]According to toll records from a cell phone seized from ESTRADA the same day, telephone number (909) 770-4936 (subscribed to Ricardo Estrada), Estrada's cellular phone called ROBERTO SOLORIO's cell phone, 978-223-0838, and engaged in a seven-minute conversation at 9:54 p.m. on April 30, 2004.  (This telephone number was not subject to a Title III wiretap).

and entered Room #21, the room that ESTRADA had checked into at 1:00 a.m.

At 7:26 a.m., ANDRES called AGUILAR and told him, "Call Maria and tell her, listen, that guy is calling you, the old man is calling you, that he wants to talk to you, just call him . . . I think he is going to go with you."  At 7:27 a.m., AGUILAR called Escobar and asked her to call Andres.  Minutes later, at 7:29 a.m., Andres received a call from ESCOBAR.  During the call, Andres asked Maria to go to the place they were yesterday 172 Lake Street in Peabody.

At approximately 8:10 a.m., the video camera across the street from 6 Endicott Street recorded Maria Escobar get into a Land Rover parked in the driveway and depart the area.

More than an hour after AGUILAR and SOLORIO arrived at the Countryside Motel, MSP Sgt. Quinn observed the same Land Rover in which Escobar departed 6 Endicott Street arrive at the rear of the motel.  The Land Rover parked in front of AGUILAR's room, #14, and all three occupants  - Andres, who was the driver, and two passengers SOLORIO and Escobar - got out of the vehicle. Andres Martinez then pointed toward Room #14 and told Escobar to go to that room to accompany "Lik" (AGUILAR).  Andres (the driver) and SOLORIO then got into the blue Land Rover and drove away.

At approximately 8:30 a.m., agents watched AGUILAR get into the yellow Cadillac and back-up to the doorway of Room #21, ESTRADA's room.  Around the same time, agents observed ESTRADA

6

standing in front of Room #21 talking on a cell phone.
(According to toll records, at 8:36 a.m., ESTRADA's telephone,
909-770-4936 called itself; which is typically done to check
voice-mail).   AGUILAR walked past ESTRADA into Room #21 and
walked out with two black suitcases similar in size, shape, and
color to the suitcase ESTRADA was observed carrying into Room
#21.   AGUILAR put the two black suitcases into the trunk of the
yellow Cadillac as Escobar stood off to the left side of the
Cadillac.   Both AGUILAR (the driver) and Escobar got into the
Cadillac and drove to 6 Endicott Street in Danvers.   While
driving, AGUILAR told Escobar that he was nervous and said that
he would never do anything like this again.

> D.    Seizure of 50 Kilograms of Cocaine at 6 Endicott Street
>        <u>in Danvers, MA</u>

Agents followed the yellow Cadillac to 6 Endicott Street in
Danvers.   At 8:38 a.m., the video camera across the street
recorded AGUILAR and Escobar arrive at 6 Endicott Street in the
Cadillac which backed into the driveway.   At 8:39 a.m., AGUILAR
called Andres and told him, "I have the clothing and it's very
clean already."   Meanwhile, agents still conducting surveillance
at the Countryside Motel observed the same blue Land Rover
driving north on Route 1 towards Danvers.   Agents followed the
blue Land Rover until it arrived at 6 Endicott Street and parked
next to the Cadillac in the driveway.   Andres and SOLORIO then
got out of the blue Land Rover and entered the rear of the
residence.

At 8:55 a.m., agents observed the trunk of the Cadillac open. Minutes later, agents observed AGUILAR close the trunk of the Cadillac. After this, agents observed AGUILAR walk to the passenger door and SOLORIO walk toward the driver side as though they were preparing to leave.

Shortly thereafter, at approximately 9:00 a.m., agents approached the Cadillac and arrested AGUILAR and SOLORIO. Inside one of SOLORIO's pockets, MSP Lt. Kenneth Gil and TFA Chris Borum found a small blue cell phone with telephone number 978-223-0838 (the same telephone number which Andres had given to the "Nephew" in code and the same number that had been used to contact ESTRADA the night before).

At the same time, SA Drouin, MSP Sgt. Quinn, and TFA Kelly entered 6 Endicott Street to execute an arrest warrant for Andres Martinez. SA Drouin and TFA Kelly found Andres Martinez in the kitchen and placed him under arrest. Not far from the kitchen in the living room, SA Drouin found two large black suitcases laying on the floor of the living room. The suitcases were of the same size, shape and color of those agents had observed ESTRADA deliver to AGUILAR a half-hour before. The cover to both suitcases were open and inside were fifty kilograms of cocaine.[5] Inside Andres' pocket, SA Drouin found a cellular phone with number 603-265-0739, one of the cell phones on which Andres was

---

[5] A representative sample of which was analyzed by DEA Forensic Chemist Jennifer Chu and determined to be cocaine hydrochloride, 86% strength. The total weight of the substance was determined to be 50.18 kilograms.

intercepted pursuant to the Title III wiretap.

Next to the suitcases on a coffee table, SA Drouin also found a
Nextel cellular phone with number 323-834-4640, the other cell
phone on which Andres was intercepted pursuant to the wiretap.
In one of the upstairs bedrooms, Det. Kenneth Estes of the Lynn
Police Department found and arrested Maria Escobar.

Following the arrest of AGUILAR, SOLORIO, Andres, and
Escobar at 6 Endicott Street, agents detained ESTRADA as he
attempted to drive off in the 18 wheeler truck in the parking lot
of the Countryside Motel.  Law enforcement agents searched the
cab of the 18 wheeler and found a piece of paper with a
handwritten telephone number, (978) 223-0838, the <u>same</u> phone
number that Martinez recited to "the Nephew" (in code) on April
30, 2004 and which "the Nephew" said he would give his associate
so that Martinez and the associate could speak directly about
delivery of the drug load.  Additionally, according to records
from the company for which ESTRADA was employed as truck driver,
ESTRADA was not scheduled to make any deliveries in Massachusetts
at that time.

  E. Execution of Search Warrant at 172 Lake Street in
   <u>Peabody, MA</u>

Also on May 1, 2004, law enforcement agents executed a
search warrant at 172 Lake Street in Peabody, the residence where
DANIEL AGUILAR and ROBERTO SOLORIO were residing with Andres
Martinez.  During the course of the search, agents found a 9mm
gun holster, 9mm ammunition, empty bottles of boric acid, and

other materials consistent with the packaging of narcotics.

    F.   <u>Expected Testimony of Maria Escobar</u>

Maria Escobar, who has also used the name Luz Luciano, met Andres and Valentin at a restaurant called *El Quetzal* that the family of her ex-husband, Carlos Arguetta, owned in Lynn, MA. While Escobar was still living with Arguetta, Andres and Germosen brought a small safe over to their apartment in Peabody and put it into the laundry room. Weeks later, Andres brought over a cardboard box and put it into the laundry room. Because neither Arguetta nor Andres would speak to Escobar about what was inside these boxes, Escobar suspected it was drugs.

After Escobar's husband ended their relationship, Andres convinced Escobar to accompany him as drove to see various people in Lynn and Peabody. During these drives, Escobar saw Andres deliver Bible-book shaped packages to various individuals. Andres later told Escobar that he was delivering cocaine to his customers. Andres paid Escobar $400 a week to assist him in these cocaine deliveries. Escobar later made cocaine deliveries on her own at Andres' direction. During the time that Andres was in Mexico, Escobar also made a handful of cocaine deliveries for "Manolo" (Manuel Germosen) and Valentin Martinez.

After Andres returned from Mexico to Massachusetts in early 2004, Andres again asked Escobar to assist him in his cocaine sales. Andres told Escobar that he was having problems with Valentin and Manolo. Andres offered Escobar $1,000 to begin working with him and offered to have Escobar live at a house in

Danvers at 6 Endicott Street.  On March 30, 2004, MSP Sgt. Quinn pulled the trash after observing Sagario Godinez, Andres' wife, place the trash near the curb.  Inside the trash, Sgt. Quinn found empty bottles of boric acid, a common cutting agent for cocaine.

Earlier in April 2004, Andres had told Escobar that he would soon expecting a shipment of cocaine to arrive on a truck. Around this same time, Andres introduced Escobar to a man from Mexico nicknamed "Lik" (DANIEL AGUILAR).  "Lik," along with another skinny Mexican male (ROBERTO SOLORIO) were living with Andres at 172 Lake Street in Peabody.  Andres asked Escobar to drive around with Lik so he could learn the area.  Lik told Escobar that he and Solorio were there to work for Andres until the cocaine shipment arrived and afterward were going to return to Mexico.

G.   Expected Testimony of Rogelio Garcia

One of the members of the organization was defendant Rogelio Garcia.  In early 2003, Garcia started working for Valentin Martinez making deliveries of cocaine.  In order to make these cocaine deliveries, Valentin gave Garcia a 1997 Mercury Mountaineer equipped with a hidden electronic storage compartment known as a "hide."  On July 24, 2003, MSP Sgt. Thomas Quinn and other law enforcement agents seized 17 kilograms of cocaine that Garcia and Valentin delivered to one of Valentin's cocaine

11

customers, "the Ramones" (defendant Carlos Rojas[6]).  Sgt. Quinn observed Garcia switch cars with Rojas to make the delivery of cocaine.  Sgt. Quinn later participated in the seizure of cocaine at an apartment located at 3620 Mystic Valley Parkway, #707, in Medford, MA.

Later that same summer, following Valentin's instructions, Garcia and defendant Carlos Arguetta, Escobar's ex-husband, met a tractor trailer truck at a parking lot on Route 1 in Peabody. (The same general location where the transfer of the two suitcases of cocaine took place on May 1, 2004).  The truck was from California.  The driver of the truck gave Garcia and Arguetta several moving boxes that contained approximately 90 kilograms of cocaine.  Garcia and Arguetta transported this cocaine back to 17 Farm Avenue in Peabody, MA, one of several residences used by the organization to stash and process the cocaine.  On another occasion, Garcia drove from Massachusetts to Arizona to deliver approximately $500,000 in drug proceeds.  On September 17, 2003, DEA SA Jean Drouin and MSP Sgt. Quinn took the trash from 17 Farm Avenue and found, among other items, wrappings consistent with the size of kilograms of cocaine, empty moving boxes, and an airport luggage receipt for a flight from Phoenix, Arizona to Boston.

---

[6]Defendant Carlos Rojas is currently a fugitive.

II.   SUMMARY OF APPLICABLE LAW

        A.   Overview of Conspiracy Law

        Each of the defendants are charged in the pending Second
Superseding Indictment with conspiracy to distribute cocaine in
violation of 21 U.S.C. § 846.  The Indictment also contains an
additional allegation pursuant to the penalty provisions of 21
U.S.C. § 841(b)(1)(A)(iii) that the conspiracy involved at least
five kilograms of cocaine.  Each of the defendants are also
charged in Count Nine which charges possession with intent to
distribute cocaine.  This charge arises out of the seizure of the
50 kilograms of cocaine on May 1, 2004.

        A conspiracy is essentially "an agreement to disobey or to
disregard the law." United States v. Drougas, 748 F.2d 8, 15 (1st
Cir. 1984).  To establish the crime of drug conspiracy, the
government must prove: (1) that the conspiracy charged in the
indictment existed; (2) that the defendant knowingly and
intentionally joined the conspiracy; and (3) that the defendant
intended that the object of the conspiracy (distribution of
cocaine) be accomplished.  See United States v. Nelson-Rodriguez,
319 F.3d 12, 27-28 (1st Cir. 2003); United States v. Gomez, 255
F.3d 31, 35 (1st Cir. 2001); United States v. Flores-Rivera, 56
F.3d 319,324 (1st Cir. 1995)(elements of conspiracy to import
cocaine established, absent actual importation of cocaine, where
there was knowing and voluntary participation in conspiracy, and
intent to effectuate object of conspiracy), citing, United States
v. Piper, 35 F.3d 611, 615 (1st Cir. 1994). Evidence of an overt

                                13

act is not required to establish a drug conspiracy under 21 U.S.C. §846.  <u>United States v. Shabani</u>, 513 U.S. 10, 11 (1994).

    1.  <u>First Element - Existence of Conspiracy</u>:

To meet the first element, the government needs to prove the existence of a express or tacit agreement to violate the drug laws.  <u>United States v. Rivera-Santiago</u>, 872 F.2d 1073, 1079 (1st Cir. 1989)("Because of the secretive nature of the crime, it is recognized that the agreement may be express or tacit.  The agreement, whether tacit or express, may be proven by circumstantial as well as express evidence.  A common purpose and plan may be inferred from a development and collocation of circumstances").  The First Circuit has recognized that many conspiracies are based on tacit agreements, due to the secretive nature of crime.  <u>See</u> <u>United States v. Moran</u>, 984 F.2d 1299, 1300 (1st Cir. 1994); <u>Rivera-Santiago</u>, 872 F.2d at 1079; <u>United States v. Glenn</u>, 828 F.2d 855, 857 (1st Cir. 1987).  Tacit agreements may be proven through the use of circumstantial evidence.  <u>Rivera-Santiago</u>, 872 F.2d at 1079; <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1173 (1st Cir. 1993) ("There are no particular formalities that attend this showing:  the agreement may be express or tacit and may be proved by direct or circumstantial evidence."); <u>United States v. O'Campo</u>, 973 F.2d 1015, 1019 (1st Cir. 1992) (no need for express agreement; circumstantial evidence sufficient); <u>United States v. Pallindo</u>, 203 F.Supp. 35, 37 (D.Mass.1962) ("An agreement may be shown by conduct, by a wink or a nod, by a silent understanding to share a purpose to violate the law").

14

In this case, the government will introduce evidence of the
existence of the conspiracy, including conspiratorial acts that
do not directly involve the defendants at trial.  For example,
the government will introduce evidence regarding the seizure of
17 kilograms of cocaine in June 2003 for an event involving
Rogelio Garcia, Valentin Martinez, and Carlos Rojas.  Such
evidence is necessary to prove the existence of the conspiracy, a
element of the charged offense.

> 2.    Second Element - Membership in the Conspiracy

The second element that the government must prove is that
the defendant knowingly and intentionally (not by mistake or
accident) joined the conspiracy.  To prove the defendant
knowingly joined the agreement, the government must show the
defendant was aware of the "essential nature of the plan, and
their connections with it," United States v. Rivera-Santiago, 872
F.2d at 1079, quoting Blumenthal v. United States, 332 U.S.
539,557 (1947).  The defendant does not have to be aware of all
the details of the conspiracy or of all identities of the other
conspirators.  United States v. Guerra-Garcia, 336 F.3d 19, 23
(1st Cir.), cert. denied, 540 U.S. 961 (2003).  So long as the
defendant is aware that the conspiracy extends beyond his or her
individual role, the knowledge element is met.  Rivera-Santiago,
872 F.2d at 1079.

> 3.    Third Element - The Intent to Accomplish the Object:

The third element the government must prove is that the

defendant had the intent to agree and the intent to facilitate the criminal object of the conspiracy.  United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994)(the government must "prove an intent to agree and an intent to effectuate the commission of the substantive offense." However, the defendant need not have the intent to personally commit the crime, just assist in its commission.  Id. at 615 ("A defendant need not have had the intent to personally commit the substantive crime"). Both the intent to agree and the intent to facilitate the object of the conspiracy may be inferred from circumstantial evidence.  United States v. Morales-Madera, 352 F.3d 1, 12 (1st Cir. 2003), cert. denied, 541 U.S. 965 (2004).  Nevertheless, without anything more, the defendant's mere presence at the scene of the crime or mere association with conspirators is not sufficient evidence to establish the required intent.  United States v. Nelson-Rodriguez, 319 F.3d at 28.

Finally, it is well settled that 21 U.S.C. Section 841(a) does not require that a defendant knew the kind or quantity of drugs involved in the offense: "The plain language of § 841(b) requires the government to prove only that the offense 'involved' a particular type and quantity of drugs, not that the defendant knew that he was distributing that particular drug type and quantity." United States v. Nelson-Rodriguez, 319 F.3d 12, 44 (1st Cir. 2003), quoting United States v. Collazo-Aponte, 281 F.3d 320, 326 (1st. Cir.2002).  Here, the object of the

16

conspiracy, distribution of cocaine, only requires that the
defendant knowingly and intentionally distributed a controlled
substance.

    4.    <u>Drug Weight Allegation</u>

    In <u>Derman v. United States</u>, 298 F.3d 34 (1st Cir. 2002), the
First Circuit clarified the application of drug weight
determinations to conspiracy cases, explaining that, "in a drug
conspiracy case, the jury should determine the existence *vel non*
of the conspiracy as well as any facts about the conspiracy that
will increase the possible penalty for the crime of conviction
beyond the default statutory maximum; and the judge should
determine, at sentencing, the particulars regarding the
involvement of each participant in the conspiracy."  <u>Derman</u>, 298
F.3d at 42.  "The rule, then, is that the government need only
allege and prove to the jury the bare facts necessary to increase
the statutory sentencing maximum *for the conspiracy as a whole*."
<u>Id</u>. at 43.  The Court in <u>Derman</u> further specified that:

> This does not mean that a jury need return a special
> verdict describing the precise amount of drugs involved
> in the conspiracy.  It is enough that the jury
> supportably determines, beyond a reasonable doubt, that
> the conspiracy involves a drug quantity that surpasses
> the threshold amount needed to trigger the relevant
> (higher) statutory maximum.
>
> <u>Id</u>. at 42, n. 4.

Thus, the higher statutory maximums are triggered by a jury
finding that the conspiracy as a whole involves a drug quantity
exceeding the statutory threshold – here, more than five

kilograms. See United States v. Bailey, 270 F.3d 83, 89-90 (1st Cir. 2001)(error where defendant sentenced above statutory maximum when no finding of drug quantity that would trigger higher statutory maximum).

The question of what quantity of cocaine was foreseeable to a defendant is a question to be determined by the Court at sentencing by a preponderance of the evidence. Following the Supreme Court's decision in Harris v. United States, 122 S.Ct. 545 (2002), a fact setting a mandatory minimum could be found by the sentencing judge by a preponderance. See also United States v. Colin-Solis, 354 F.3d 101, 103-4 (1st Cir. 2004)("to apply the mandatory minimum to a particular coconspirator, the sentencing court must make a specific finding, supportable by a preponderance of the evidence, ascribing the triggering amount to that coconspirator");United States v. Robinson, 241 F.3d 115 (1st Cir. 2001); United States v. Eirby, 262 F.3d 31 (1st Cir 2001); United States v. Copeland, 2003 WL 431897 (6th Cir. Feb. 25, 2003)(amending earlier opinion); but cf. United States v. Martinez, 234 F.Supp. 80 (D.Mass. 2002).

The First Circuit has also made clear that imposing any "remedy" beyond that announced by United States v. Booker, 125 S.Ct. 738 (2005) is not only unnecessary, but "wrong":

> There was a period between Blakely and Booker
> when the district courts were forced to
> predict and improvise. Some courts, as the
> court did here [referring to United States v.
> Green, 346 F.Supp.2d 259 (D. Mass. 2004)]

>predicted wrongly that the Sixth Amendment
>concerns required as a remedy that certain
>issues (for instance, drug quantity) be
>decided by a jury, not a judge.  It is now
>well settled that this was wrong; the remedy
>was to make the Guidelines non-mandatory.

United States v. Yeje-Cabrera, 430 F.3d 1, 17 (1st Cir. 2005).

In doing so, the First Circuit has squarely rejected the view

that a district court could properly decide sentencing facts by

adopting the facts found by a jury beyond a reasonable doubt:

>The district court's Apprendi rationale for
>limiting its consideration of drug quantity
>was simply a wrong guess as to the direction
>the law would take.  The district court was
>not "constrained" by the jury's verdict, as
>it thought it was, to finding less than 500
>grams of cocaine.  Instead, it could (and
>should) have found Olivero responsible for
>the amount of cocaine established by a
>preponderance of the evidence against him –
>though of course, the ultimate sentence may
>not exceed the statutory maximum of 20 years.

Yeje-Cabrera, 430 F.3d at 23 (emphasis supplied); see also United

States v. Picanso, 333 F.3d 1, 26 (1st Cir. 2003) (noting that it

"would clearly be legal error" for a district court simply to

adopt a jury's factfinding in imposing a sentence).

    In this case, in accordance with Derman, Yeje-Cabrera, and

the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S.

466 (2000), the government will propose a special verdict form

that will seek a jury determination regarding simply the

threshold amount of cocaine, five kilograms.  This determination

should be made only after consideration of the elements of conspiracy.

    4.  <u>Admissibility of Co-Conspirator Statements as Non-Hearsay</u>

Federal Rule of Evidence 801(d)(2)(e) provides that a "statement by a coconspirator of the party during the course and in furtherance of the conspiracy" is not considered to be hearsay and thus is admissible into evidence. <u>See</u> Fed. R. Evid. 801(d)(2)(e). To make use of this rule, the government must prove by a preponderance of evidence that 1) a conspiracy existed between the declarant of the statement and the defendant, and that the declarant uttered the statement 2) during the course of and 3) in furtherance of the conspiracy. <u>See</u> <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987); <u>United States v. Piper</u>, 298 F.3d 47, 52 (1st Cir. 2002); <u>United States v. Petrozziello</u>, 548 F.2d 20, 22 (1st Cir. 1977). In the First Circuit, a judge may conditionally admit coconspirator statements during the trial, and make a final determination on admissibility at the close of the evidence. <u>United States v. Bradshaw</u>, 281 F.3d 278, 283 (1st Cir. 2002).

To satisfy the first requirement, the government must show that it is more likely than not that the defendant was involved in the conspiracy, based in part on evidence other than the contested statement. <u>United States v. Piper</u>, 298 F.3d at 52; <u>United States v. Sepulveda</u>, 15 F.3d 1161, 1181-82 (1st Cir. 1993). The trial court is allowed to consider the content of the

coconspirator's statement and the surrounding circumstances in this inquiry, but the statement itself is not sufficient to prove the defendant's involvement.  United States v. Sepulveda, 15 F.3d at 1181-82.  The question of whether the defendant was involved in a conspiracy will duplicate the elements of criminal conspiracy (see above), although the standard of proof is lower. See United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992); United States v. Gomez-Pabon, 911 F.2d at 856. However, if a large conspiracy involving multiple participants is charged in the indictment, the government does not have to prove that the defendant was part of that large conspiracy to admit the coconspirator's statement into evidence.  The government need only prove that a lesser conspiracy existed between the defendant and the declarant.  United States v. Piper, 298 F.3d at 54-55; Dworken v. United States, 855 F.2d 12, 24 (1st Cir. 1988). Further, the statement may be admissible against the defendant even if the statement was made before the defendant joined the conspiracy, because defendants are deemed to have adopted previous coconspirator statements by the act of joining.  United States v. Saccoccia, 58 F.3d 754, 778 (1st Cir. 1995).

To determine whether a statement was made "during the course of" the conspiracy, the trial court may rely solely upon the statement itself.  See United States v. Piper, 298 F.3d at 52, 54.  A statement is considered to be "during the course of" the conspiracy so long as the conspiracy is ongoing and the defendant is a participant in the conspiracy.  United States v. Palow, 50,

21

56-57 (1st Cir. 1985); United States v. Mason, 658 F.2d at 1269.
If a conspiracy consists of an ongoing criminal enterprise, it is
"presumed to exist until there has been an affirmative showing it
has terminated."  United States v. Piper, 298 F.3d at 53
(citations omitted); United States v. Palow, 777 F.2d at 57
(citing Fed. R. Evid. 801(c)(2)(e), advisory committee's notes).
Similarly, the burden is on the defendant to prove he withdrew
from a conspiracy, by making an affirmative showing that he
confessed to law enforcement, or that he clearly communicated to
other coconspirators that he was leaving the conspiracy.  United
States v. Piper, 298 F.3d at 53.  Otherwise, statements made by
coconspirators may be used against the defendant.  See id.

        In order to prove the statement was "in furtherance" of the
conspiracy, the government may depend solely on the statement
itself.  United States v. Piper, 298 F.3d at 52, 54.  The
government must show that it is more likely than not that the
coconspirator's statement advances the goals of the conspiracy in
some way.  See United States v. Martinez-Medina, 279 F.3d at 117.
Statements that are merely "idle conversations among criminal
partners" do not meet the "in furtherance of" requirement.  Id.

        The First Circuit has generally interpreted the "in
furtherance" requirement broadly, so long as the intent behind
the statements appears to be to assist the conspiracy in some
way. See United States v. Martinez-Medina, 279 F.3d at 117;
United States v. Sepulveda, 15 F.3d at 1180-81; United States v.
Masse, 816 F.2d 805, 811 (1st Cir. 1987).  In United States v.

Sepulveda, the First Circuit found that the reporting of a significant past event was considered to be "in furtherance" because such events can have a serious impact on the outcome of the conspiracy. See 15 F.3d at 1180 (citation omitted).  There, one coconspirator told another about how police had found drugs on him during a search, presumably as a warning of danger to the conspiracy. Id.  Similarly, the First Circuit has found a conversation explaining the mode of operation of the conspiracy to be "in furtherance" of a conspiracy.  United States v. Masse, 816 F.2 at 811.  In that case, a coconspirator told an undercover policeman acting as a buyer that the defendant was the source of the drugs, presumptively in order to reassure and forge trust with the buyer. See id.

However, the First Circuit and other Circuits generally draw the line at casual discussions of past events that appear to be made with a purpose other than advancing the conspiracy. United States v. LiCausi, 167 F.3d 41, 50 (1st Cir. 1999); United States v. Darwich, 337 F.3d 645 (6th Cir. 2003). In a case where a conspirator told his girlfriend about supermarket robberies he had committed and attempted to commit in the past, the First Circuit found it to be idle chatter and therefore inadmissible. United States v. LiCausi, 167 F.3d at 50.  There, the court found that the context suggested the coconspirator was merely "blowing off steam or venting anxiety" as opposed to reporting a significant event to assist the conspiracy.  Id.  In United States v. Darwich, the Sixth Circuit found that the statements

23

made by two nephews to their uncle about how much marijuana they had bagged at work each night was idle chatter.  337 F.3d at 657, 658.  Again, the court interpreted this as "casual conversation" about the nephews' days at work, rather than information conveyed to help the conspiracy. Id. at 658.

   6.  The Law of Multiple Conspiracies

     Defendants charged with conspiracy often respond with the defense of multiple conspiracy.  In this defense, the defendant argues that the evidence shows that he or she was involved only in a lesser conspiracy, not the large conspiracy charged in the indictment.  See United States v. Perez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003), cert. denied sub nom. Ruiz v. United States, 541 U.S. 1005 (2004); United States v. Soto-Beníquez, 356 F.3d 1, 18 (1st Cir. 2003), cert. denied sub nom. Vega-Pacheco v. United States, 541 U.S. 1074 (2004), cert denied sub nom. Vega-Colon v. United States, 541 U.S. 1074 (2004).

     The question of whether the evidence at trial proves multiple lesser conspiracies or the single conspiracy charged in the indictment is a matter of fact for the jury to decide. United States v. Drougas, 748 F.2d at 17.  However, in the First Circuit, a multiple conspiracy jury instruction is only required when "a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged," based on the evidence at trial.  United States v. Balthazar, 360 F.3d 309, 315 (1st Cir. 2004); United States v. Brandon, 17 F.3d 409, 449 (1st Cir. 1994).  Thus the trial court

should allow a multiple conspiracy charge only when the finding of multiple conspiracies is a "plausible conclusion". United States v. Brandon, 17 F.3d at 450.

Several other Circuits have adopted standards on multiple conspiracy instructions that are similar to that of the First Circuit. See United States v. Erwin, 793 F.2d 656, 662 (5th Cir., 1986); United States v. Anguiano, 873 F.2d 1314, 1317 (9th Cir., 1989); United States v. Calderon, 127 F.3d 1314, 1328 (11th Cir., 1997). The Ninth and Eleventh Circuit have stated that a multiple conspiracy instruction is required when the indictment charges many defendants with an overall conspiracy, but the proof indicates a jury could reasonably conclude that multiple conspiracies existed. United States v. Anguiano, 873 F.2d at 1317; United States v. Calderon, 127 F.3d at 1329. The Fifth Circuit has adopted a slightly stricter standard, where a multiple conspiracy jury instruction must be given if evidence "arguably raises a question of multiple conspiracy." See United States v. Erwin, 793 F.2d at 662.

The First Circuit takes a very fact specific approach to determining whether a reasonable jury could find more than one conspiracy. See United States v. Brandon, 17 F.3d at 449-450; United States v. Dwyer, 843 F.2d 60, 62-63 (1st Cir. 1988). In United States v. Brandon, the First Circuit found that the trial court had probably erred in refusing to grant a multiple conspiracy jury instruction because the record in that case was voluminous and very complex. 17 F.3d at 450. The case involved a

25

large loan fraud scheme with many participants, where the facts
suggested that some of the participants were unaware of the
essential nature or ultimate purpose of the scheme. See id. at
418-421.  In United States v. Dwyer, the court found that the
court may have erred in refusing to grant a multiple conspiracy
jury instruction where the trial court itself had suggested the
existence of multiple conspiracies in an 801(d)(2)(e) evidentiary
hearing.  See 843 F.2d at 61.  There, the defendant and other
employees of a construction company made illegal draws on a loan,
and the other employees continued to make illegal withdrawals
without the defendant's knowledge or participation.  Id. at 62.

    The multiple conspiracy defense is often used in hub-and-
spoke conspiracy cases.  A hub-and-spoke conspiracy (sometimes
referred to as a wheel conspiracy) is a model in which a central
"hub" figure or group deals with each coconspirator or "spoke"
individually, so that the spokes may have little or no contact
with each other.  United States v. Newton, 326 F.3d 253, 255 n.2
(1st Cir. 2003).  Although a hub-and-spoke conspiracy may
resemble multiple conspiracies, many hub-and-spoke conspiracies
are shown to be single conspiracies.  See United States v.
Rivera-Rodriguez, 318 F.3d 268, 273 (1st Cir. 2003); United
States v. Portela, 167 F.3d 687, 697 (1st Cir. 1999); United
States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995).

    A hub-and-spoke conspiracy is considered to be single
conspiracy if there is a "rim" surrounding the spokes.  See
Kotteakos v. United States, 328 U.S. 750, 754-755, 773 (1946).

26

The First Circuit has suggested that a rim exists if the spokes
have at least a general knowledge of the other spokes existence.
See Portela, 167 F.3d at 697; United States v. DiGregorio, 605
F.2d 1184, 1192 (1st Cir. 1979).  This knowledge can be inferred
in drug conspiracy cases if there is evidence that various spokes
of the conspiracy depended on each other for the health of their
own business.  United States v. Martinez Medina, 279 F.3d 105,
114 (1st Cir. 2002); Portela, 167 F.3d at 697. In the United
States v. Portela, all the spokes of a cocaine importing hub-and-
spoke conspiracy were found to be part of one conspiracy, because
all the spokes relied on each other's existence for their
individual businesses to survive.  See 167 F.3d at 696-699.  The
drug supplier, for example, depended on the existence of the drug
smuggler and of individual dealers within the United States to
ensure his supplying business remained profitable, even if the
drug supplier did not personally know the dealers or the
smuggler.  See id.

B.    Admissibility of Title III Intercepted Telephone
      Conversations

      1.    Voice Identification

      Authentication under Federal Rule of Evidence 901(b)(5)
allows a witness to identify a voice by opinion evidence based
upon "hearing the voice at any time under circumstances
connecting it with the alleged speaker." Fed. R.Evid. 901(b)(5).
Further, the voice may be heard either firsthand or through some
sort of recording or electronic transmission.  Id.

Because Rule 901(b)(5) permits a voice on a wiretap to be identified based on that voice being heard "at any time," participants in a conversation as well as nonparticipants may identify the voice.  Fed R. Evid. 901(b)(5) advisory committee note.  Generally, nonparticipants may identify a voice so long as they have "minimal familiarity" with the person connected to the voice.  See United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005); United States v. Degaglia, 913 F.2d 372, 376 (7th Cir. 1990)(citations omitted); see also United States v. Kornegay, 410 F.3d 89 (1st Cir. 2005) (finding that witness must be "sufficiently familiar" to visually identify the witness).  "Once minimal familiarity is satisfied, it is for the jury to assess any issues regarding the extent of the witness' familiarity with the voice." Bush, 405 F.3d at 919.  In United States v. DiMuro, the First Circuit found that a law enforcement agent could identify the voice from intercepted conversations as the defendant based on talking to the defendant for "a short period" at his house and then talking to him a year later at the federal courthouse.  United States v. DiMuro, 540 F.2d 503, 514 (1976).  Other circuits have found as little as 30 seconds creates sufficient familiarity in order to authenticate a voice on a recording.  See, e.g., United States v. Cooper, 868 F.2d 1505, 1519 (6th Cir. 1989).

When evidence of the witness' familiarity with a certain person is weak, the First Circuit has allowed circumstantial evidence may be used to bolster a voice identification.  United

28

States v. Portalla, 985 F.2d 621, 623 (1st Cir. 1993); United
States v. Angiulo, 847 F.2d 956, 967 (1st Cir. 1988); United
States v. DiMuro, 540 F.2d at 513.   In United States v. Portalla,
a detective identified the voice in certain intercepted
conversations as the defendant based on contact with him that had
been frequent but had been over two years ago. 985 F.2d at 623.
While the court found that this evidence "might well have been
stronger," it was sufficient because it was buttressed by
circumstantial evidence of the tapped telephone belonged to the
defendant's sister in law, a phone similar to the tapped phone
being found on the defendant's person, and the voice responding
on that line to the defendant's nickname. Id.   Similarly, in
United States v. Angiulo, the voice identification of a detective
who had engaged in personal conversations with the defendant was
supported by circumstantial evidence that the defendant was
present at the address of the phone that was tapped during
intercepted conversations.   847 F.2d at 967.   Circumstantial
evidence may even be sufficient to prove identity.   United States
v. DiMuro, 540 F.2d at 514.   In United States v. DiMuro, voice
identification was deemed sufficient when a voice in an
intercepted conversation identified himself by his first name and
gave his telephone number. Id.

        Generally, voice identification is a proper subject for lay
testimony.   See Fed. R. Evid. 901(b)(5) advisory committee's
note; United States v. Salimou, 182 F.3d 63, 73-74 (1st Cir.
1999); United States v. Hardwell, 80 F.3d 1471 (10th Cir. 1996).

Expert testimony is usually not appropriate because a lay person without any training can identify voices that they have heard before, or notice differences between the way two voices sounded in two different recordings. <u>United States v. Salimou</u>, 182 F.3d at 74. In <u>United States v.Salimou</u>, the First Circuit found that expert testimony of a linguist was properly excluded because the jurors could determine the differences between voices in two different tapes themselves without any specialized knowledge. <u>Id.</u> Expert testimony on voice identification may only be admitted if it is based on some sort of scientific or specialized knowledge, such as a spectrogram computer program that analyzes and compares the frequency and magnitude of speech signals from recordings. <u>See</u>, <u>e.g.</u>, <u>United States v. Salimou</u>, 182 F.3d at 63.

In this case, the government will offer the testimony of defendants Maria Escobar and Rogelio Garcia to identify most of the voices on the wiretap calls. Their testimony will demonstrate more than a "minimally adequate" foundation for familiarity with the intercepted voices. Furthermore, in some cases, the witnesses were participants in the conversations. The voices the witnesses are expected to identify include Andres Martinez, DANIEL AGUILAR, a.k.a. "Lik" and "the Nephew" in Mexico.

     2. <u>Admissibility of Transcripts</u>

In the First Circuit's opinion in <u>United States v. Rengifo</u>, 789 F.2d 975, 983 (1st Cir. 1986), the court held that English-language translations of tape-recorded conversations that

originally took place in Spanish are admissible as substantive evidence.  The court further held that such transcripts may go to the jury room and that the government may use readers to read the English translations as an alternative to playing the tape recording.  Id.

"Once translation and transcription disputes have been addressed and the transcripts have been submitted to the jury for its use, parties using audio recordings in other languages should ensure that the English transcripts become part of the record by introducing them in evidence." United States v. Morales-Madera, 352 F.3d 1, 8-9 (1st Cir. 2003).  The trial court, however, retains discretion as to what documentary evidence the jury is permitted to have during deliberations.  Id., citing United States v. McCarthy, 961 F.2d 972, 978 (1st Cir. 1992). Nevertheless, "should the defendant fail to offer either a sufficient objection during playback of the tape, or an alternative transcript, the district court does not abuse its discretion by authorizing use of the government's duly authenticated transcript during jury deliberations subject to an appropriate cautionary instruction." United States v. Ademaj, 170 F.3d 58, 65 (1st Cir. 1999)

## Conclusion

Accordingly, the government hereby submits this pretrial memorandum of law and fact for the trial beginning on February 27, 2006.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:        /s/ *Neil J. Gallagher, Jr.*
Neil J. Gallagher, Jr.
Sandra Bower
Assistant U.S. Attorneys
One Courthouse Way
Boston, MA

Date: February 14, 2006

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

<u>/s/ Neil J. Gallagher, Jr.</u>
Neil J. Gallagher, Jr.